IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-00517-RBJ

ANNALEA GREEN,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

    Defendant.

---

ORDER

---

This matter is before the Court on review of the Social Security Administration (SSA) Commissioner's decision denying claimant Annalea Green's application for disability insurance benefits under Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision.

### I.    Standard of Review.

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final decision by the Commissioner, the District Court examines the record and determines whether it contains substantial evidence to support the Commissioner's decision and whether the Commissioner applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Substantial

evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). In addition, reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

**II.   Background.**

Ms. Green was born in 1984 and is now 32 years old. *See* R. 119. She did not complete high school. R. 138. Instead, she worked full-time at a fast food restaurant as a teenager. *See id.* She stayed in this line of work for more than a decade until November 2009. R. 139.

Two years before leaving her job, Ms. Green was diagnosed with lupus. R. 217. She began experiencing swelling and pain in her joints indicative of inflammatory arthritis. R. 197–98. She sought treatment four times from November 2008 to April 2010, when most of her symptoms spontaneously subsided. R. 191–99, 217. Ms. Green subsequently became pregnant and gave birth in May 2011. R. 264. A few months later, however, many of her symptoms returned. R. 217. This time she also suffered a diminished ability to close her hands, shortness of breath, and chest pain. R. 217–18, 220. Ms. Green resumed a treatment regimen and her symptoms generally improved, though she admitted taking her medications irregularly and continuing to smoke most of a pack of cigarettes every day. R. 240, 244, 247–48, 251–52.

In 2013 Ms. Green tried working at a convenience store. R. 149. Unfortunately, she was fired after two months because she called out of work too many times in response to her supervisor scheduling her for extra shifts. R. 154. These long hours required significant lifting and standing without scheduled breaks, aggravating Ms. Green's symptoms. R. 32, 154.

### A. Procedural History.

In October 2012 Ms. Green applied for disability insurance benefits, alleging disability beginning November 1, 2009. R. 12, 146, 165. The claim was initially denied on August 26, 2013. R. 49–62. Ms. Green requested a hearing, which was held in front of Administrative Law Judge (ALJ) Richard J. Maddigan on August 18, 2014. R. 28. The ALJ issued a decision denying benefits on August 27, 2014. R. 11. The Appeals Council denied Ms. Green's request for review on January 12, 2016, rendering the ALJ's determination the final decision of the Commissioner for purposes of judicial review. R. 1. Ms. Green filed a timely appeal in this Court.

### B. The ALJ's Decision.

The ALJ issued an unfavorable decision after evaluating the evidence according to the SSA's standard five-step process. R. 14–24. First, he found that Ms. Green had not engaged in substantial gainful activity since her alleged onset date of November 1, 2009. R. 16. At step two, the ALJ found that Ms. Green had the severe impairments of systemic lupus erythematosus, polyarticular inflammatory arthritis, obesity, interstitial lung disease, and obstructive lung disease. R. 16. At step three, the ALJ concluded that Ms. Green did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 17.

The ALJ then found that Ms. Green retained the residual functional capacity (RFC) to sit, stand, and walk without limitation throughout an eight-hour workday, though she is limited to lifting 30 to 40 pounds and grasping, handling, feeling, reaching, pushing, and pulling only occasionally. R. 18. At step four, the ALJ concluded that Ms. Green is unable to perform any

past relevant work. R. 22. Finally, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Ms. Green could perform. R. 23. Therefore, the ALJ concluded that Ms. Green was not disabled. R. 24.

### III. Discussion.

Ms. Green charges that the ALJ made several errors at steps four and five. Specifically, Ms. Green argues that this case warrants remand on the following grounds: (1) the ALJ's RFC determination is not supported by substantial evidence because Ms. Green's rheumatologist, Dr. Corbett, submitted a new and material medical opinion after the ALJ rendered his decision; (2) the opinion of the consultative examiner, Dr. Jendry, should be interpreted to mean that Ms. Green requires unscheduled breaks; (3) the ALJ's credibility determination for Ms. Green is not based on substantial evidence; and (4) the ALJ's finding that Ms. Green could perform work existing in significant numbers in the national economy is not supported by substantial evidence. The Court will discuss each argument in turn.

#### A. Dr. Corbett's Opinion.

Two weeks after the ALJ issued his unfavorable opinion, Dr. Corbett completed a "Lupus (SLE) Residual Functional Capacity Questionnaire." R. 323–28. Dr. Corbett checked boxes to indicate his opinion that Ms. Green can sit for only two hours in an eight-hour workday and can stand or walk for less than two hours a day. R. 326. The doctor also estimated that Ms. Green could use her hands to grasp, turn, and twist objects and use her fingers for fine manipulations during only 20% of the day. R. 327. But Dr. Corbett offered no justification for these extreme restrictions. Instead, the only sentence he wrote in the six-page questionnaire was: "The patient has been medically disabled at least since March 2012." R. 328. And even this sentence was

written after the questionnaire was filled out; it appears at the end of the form after Dr. Corbett's signature block and is followed by a second signature. *See id.*

Check-the-box opinions are not inherently suspect, but they are meaningful only when supported "by thorough written reports or persuasive testimony." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). Such evidence is absent here.

Dr. Corbett's medical reports do not mention anything that would interfere with Ms. Green's ability to sit, stand, or walk. *See* R. 216–52. Instead, his only relevant treatment notes say: "Hips, knees, ankles and feet are unremarkable to exam." R. 218. Dr. Corbett's failure to mention any weakness in Ms. Green's capacity for sitting, standing, or walking over the entire course of treatment actually suggests that these abilities are unaffected by her disease—not that they are severely restricted. *See* R. 218, 239–40, 250. Moreover, Ms. Green identifies nothing else in the record that could support the doctor's opinion here. *See, e.g.*, R. 316 ("She appeared to sit comfortably during the exam and without pain-mitigating movements. She . . . arose spontaneously and unaided from a seated position without discernible discomfort.").

In addition, Dr. Corbett's treatment notes provide no basis for his conclusion that Ms. Green can use her hands and fingers for at most precisely 20% of a workday. His notes show Ms. Green's tenderness and inflammation in her hands responding well to treatment over time. *See* R. 240 ("Joint pain seems to be a little better."), R. 244 ("The patient is doing well in general with some mild breakthrough pain and inflammation over the last few days."), *id.* ("Joint pain is relatively stable . . . ."), R. 243 ("Mobility and pain is a little better, despite the steroid reduction . . . ."), R. 248 ("She has a little bit of joint swelling and soreness at times, but is generally doing okay . . . ."), R. 252 ("[J]oint pain is resolved."). These symptoms returned only when Ms.

Green failed to take her medicine. *See* R. 240 ("The patient was doing reasonably well and then . . . missed doses of CellCept and prednisone. Symptoms are now worse . . . ."), R. 249 ("She continues on prednisone . . . , initially with good improvement in joint pain, but missed a few doses recently, and with increased stress, joint pain was a little bit worse again."), R. 251 ("She occasionally misses a dose or two of prednisone and has some minor breakthrough joint pain . . . ."). This evidence establishes that Ms. Green's ability to use her hands and fingers in a workplace is limited to some degree but does not sustain the position that her limitations are more restrictive than the ALJ's finding that she can use her hands "occasionally," i.e., for up to one-third of a workday. *See* Social Security Ruling (SSR) 96-9P, 1996 WL 374185, at *3 (July 2, 1996); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 ("We must give attention to the effects of medication on your symptoms, signs, and ability to function . . . in assessing the severity of your impairment.").

Ms. Green also points out in her reply brief that Dr. Corbett indicated she will "sometimes need to take unscheduled breaks during an 8 hour workday." ECF No. 19 at 1 (citing R. 326). However, Dr. Corbett's note that these unscheduled breaks during the workday will last "1-2 days" a month makes no sense. R. 326. If the doctor just meant that Ms. Green cannot work seven days a week without taking one or two days off each month, then this opinion is fully compatible with the ALJ's decision. *See* SSR 96-9P, 1996 WL 374185, at *2 (July 2, 1996) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."). If the doctor instead meant that Ms. Green needs to take an unscheduled work break once or twice a month or take one to two full days off of work every month in addition to

weekends, then this opinion finds no support in his treatment notes either. *See* R. 243 ("Fatigue and exercise tolerance is relatively stable . . . ."), R. 252 ("Her energy level is much better . . . .").

As a result, Dr. Corbett's opinion letter does not undermine the substantial evidence of record supporting the ALJ's RFC determination. *See* R. 18–22, 155–64, 212–252, 308–320.

### B. Unscheduled Breaks.

Next, Ms. Green argues that the ALJ's RFC determination is flawed because the ALJ misconstrued Dr. Jendry's opinion. Dr. Jendry wrote: "[Ms. Green] is somewhat limited by fatigue, but having said that [she] should be able to sit, stand, and walk without limitation in a normal eight-hour period as long as she has times to take breaks and rest in between." R. 319. The ALJ recited this sentence in his decision and then wrote: "[T]he general finding that the claimant needs times during the day to take breaks and rest would be reasonably accommodated by work breaks available during a typical workday." R. 22. Ms. Green insists that this conclusion is incorrect because "as long as she has times to take breaks and rest" must mean the opportunity for unscheduled breaks. She also asserts that her testimony supports that interpretation. I am not persuaded.

Dr. Jendry's view that Ms. Green requires "times to take breaks and rest" is at best ambiguous. However, "[t]he substantial-evidence standard does not allow us to displace the agencies' choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d 1080, 1088 (10th Cir. 2007) (quoting *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1030 (10th Cir. 2001). The ALJ's finding that Ms. Green's needs could be met by "work breaks available during a typical workday" is a reasonable resolution of any ambiguity here. It would

be odd for Dr. Jendry to have intended his vague comment to mean Ms. Green requires unpredictable break periods when unskilled jobs typically provide only scheduled breaks. *See* R. 47. And Dr. Jendry discussed Ms. Green's daily routine with her, yet he did not specify that Ms. Green needed the freedom to take unscheduled breaks or mention any reason why such breaks might be necessary. *See* R. 315–16. Therefore, the ALJ's interpretation of Dr. Jendry's opinion may not be disturbed.

Moreover, Ms. Green's testimony does not controvert the ALJ's finding that Ms. Green has the RFC to work with normal scheduled breaks. Ms. Green testified that she cannot predict when she needs to take a nap during the day. R. 42. But the ALJ found this part of Ms. Green's testimony unreliable given her daily activities of childcare, cleaning, cooking, shopping, and socializing. R. 22, 157–62. For example, Ms. Green wrote on her function report only that she sometimes chooses to nap when she puts her son down for a nap in the afternoon. R. 157. She also wrote on her work history report that she lost her most recent job after being overworked not because she was not given unscheduled breaks, but because "[t]hey did not give *scheduled* breaks or times to rest." R. 154 (emphasis added). There is thus substantial evidence for the ALJ's conclusion about Ms. Green's break requirements.

### C. Credibility Determination.

Ms. Green argues that the ALJ ignored some of her reports of pain and fatigue in determining that her statements about her limitations were not entirely credible. At the hearing Ms. Green testified that doing simple chores at home causes a lot of pain, that she often spontaneously feels drained, and that she needs to nap unpredictably. R. 34, 41–42.

The ALJ's credibility determination referenced Ms. Green's "reported pain and fatigue symptoms" rather than enumerate each point. R. 22. First, the ALJ discussed Ms. Green's medical history at length and concluded that "[t]he medical evidence shows that the claimant's symptoms are adequately managed when she is compliant with prescribed therapies." R. 20; *see also, e.g.*, R. 252 ("Her energy level is much better; joint pain is resolved."). The ALJ then surveyed Ms. Green's daily activities in detail, including the fact that Ms. Green is the primary caregiver for her young son, does a variety of housework "all day," cooks daily, and meets with friends every week. R. 21–22; *see also* R. 157–60. The ALJ concluded that Ms. Green's medical treatment was effective enough and her daily activities were "sufficiently varied and strenuous" for her to be able to perform work consistent with the RFC finding. R. 20, 22.

The ALJ did not err by summarizing Ms. Green's testimony instead of addressing her complaints one-by-one. Under the SSA regulations in effect at the time of the ALJ's decision,

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be *sufficiently specific* to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7P, 1996 WL 374186, at *2 (July 2, 1996) (emphasis added). Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). And a court reviewing an ALJ's decision must "exercise common sense" and "cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

Ms. Green has not shown that the ALJ's discussion of the evidence was insufficiently specific. It is unclear from her briefs what Ms. Green believes the ALJ did and did not address; she simply makes the overbroad claim that the ALJ altogether "failed to consider the subjective evidence." ECF No. 15 at 11. But the ALJ's decision did consider Ms. Green's subjective complaints and found them undermined by substantial evidence in the record. R. 20–22. Furthermore, the ALJ's evaluation of Ms. Green's successful treatment and significant daily activities was proper. *See* 20 C.F.R. § 404.1529(c)(3). Thus, there is no error here.

### D. Jobs in the National Economy.

Last, Ms. Green argues that the ALJ's step-five determination was not based on substantial evidence. At step five the ALJ relied on the vocational expert's testimony that an individual with Ms. Green's age, education, work experience, and RFC could perform the requirements of three representative occupations. R. 23–24. The ALJ found that with 546 jobs in Colorado and 57,000 jobs nationwide, these representative occupations show that jobs exist in significant numbers in the national economy that Ms. Green can perform. *See id.* Thus, the ALJ concluded that Ms. Green is not disabled because she can engage in other substantial gainful work "which exists in the national economy." *See id.*; 42 U.S.C. § 423(d)(2)(A). In Ms. Green's view, however, the ALJ failed to identify significant numbers of jobs that exists in the national economy and impermissibly failed to discuss the criteria he used to make this determination.

The Social Security Act defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C.A. § 423(d)(2)(A). This finding does not depend on "whether such work exists in the immediate area in which [a claimant] lives." *Id*.

The Tenth Circuit has adopted a multi-factor test for determining whether "significant numbers" of jobs exist. *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). The court in *Trimiar* listed several potentially relevant factors, including: "the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.* (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)). This determination "should ultimately be left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* (quoting *Jenkins*, 861 F.2d at 1087).

However, it is not clear that the *Trimiar* factors apply to this case. The Tenth Circuit has explained that *Trimiar* does not require a multi-factor analysis when the number of available jobs is "much larger" than 650 to 900. *Raymond v. Astrue*, 621 F.3d 1269, 1274 n.2 (10th Cir. 2009). The 57,000 job figure at issue here is about 50 to 100 times greater than this "extremely low" number in *Trimiar*, so it arguably escapes *Trimiar*'s reach. *See Evans v. Colvin*, 640 F. App'x 731, 736 n.4 (10th Cir. 2016) (unpublished).

Even if *Trimiar* did apply here, substantial evidence supports the ALJ's finding that 57,000 jobs is a significant number of jobs available to this claimant. Ms. Green argues that her ability to work these jobs is severely limited because she does not have a driver's license and therefore cannot drive to work. But Ms. Green's inability to drive has not equaled an inability to travel. Ms. Green goes grocery shopping every two weeks and regularly goes to friends' houses, stores, parks, and restaurants. R. 21, 159–60. She says she can walk for up to 20 minutes at a time. R. 161. She does not use public transportation, but she offers no reason why she is unable

11

to do so. R. 159. Moreover, "[a] person, otherwise able to work, is in effect offered a choice: [she] can choose either to commute the distance to [her] job or [she] can move closer and avoid the expense and inconvenience. Disability insurance is not available to fund [her] decision to live far from available jobs." *Wamsley v. Astrue*, 780 F. Supp. 2d 1180, 1193 (D. Colo. 2011) (quoting *Lopez Diaz v. Sec'y of Health Educ. and Welfare*, 585 F.2d 1137, 1140 (1st Cir. 1978)). Ms. Green's only explanation for avoiding traveling alone is that it is difficult for her when she has to carry her son. R. 159. But Ms. Green's son is nearly school-age and her parents help with childcare, suggesting that she should be able to leave for work even when her husband's job takes him out of town. *See* R. 44. On these facts, no reasonable ALJ could have concluded that the number of jobs identified was so small as to direct a finding of disability. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

## ORDER

The Court AFFIRMS the Commissioner's decision denying claimant Annalea Green's application for disability insurance benefits.

DATED this 10th day of January, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge